ORIGINAL

FILED
DEC 6 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| THE CNA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 07-858 C<br><br>Judge: ________ |

**COMPLAINT FOR DECLARATORY,**
**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

The CNA Corporation, ("CNAC") by and through its undersigned counsel, files this complaint for declaratory and injunctive relief and alleges as follows:

## I. NATURE OF THE CASE

1. Plaintiff CNAC brings this post-award procurement protest action to challenge the award decision of Defendant, the United States, acting by and through the National Institutes of Health ("NIH"), a part of the United States Department of Health and Human Services ("HHS"), under Requests for Proposals ("RFP") No. NIH-NICHD-NCS-07-11 (hereinafter the "Solicitation" or the "RFP"), entitled the National Children's Study ("NCS" or "Study"). The Solicitation at issue sought proposals from organizations to establish contacts in the community, recruit research participants and perform data collection, in support of the NCS, at Study Centers in various pre-determined Study locations throughout the United States.

2. In response to the RFP, CNAC submitted proposals for two of the pre-selected Study locations, Montgomery County, Maryland and Baltimore County, Maryland. NIH did not award CNAC a contract pursuant to the RFP, despite its meritorious proposals.

3. NIH based its decision not to award a contract to CNAC for the Montgomery County, Maryland Study location ("Montgomery County Contract") on a flawed analysis of the post-employment restrictions of 18 U.S.C. § 207 that was arbitrary, capricious, and contrary to law, when it concluded that Dr. Sarah L. Friedman, CNAC's proposed Principal Investigator ("PI") for the Montgomery County Contract, would not be able to fulfill the duties of a PI as a consequence of her former Government employment. Had NIH properly evaluated CNAC's proposal pursuant to the applicable statute and regulations, CNAC would have received award of the Montgomery County Contract. Further, the agency's analysis could not have been rational, as it is contrary to a plain reading of the law.

## II. JURISDICTION AND STANDING

4. This Court has jurisdiction over this post-award bid protest pursuant to 28 U.S.C. § 1491(b).

5. CNAC submitted proposals in response to the RFP and is an "interested party" objecting to an award decision in connection with a procurement by a federal agency and therefore has standing pursuant to 28 U.S.C. § 1491(b). CNAC was prejudiced by NIH's actions, as CNAC had a direct economic interest in the prospective contract and it suffered direct economic harm as a result of NIH's failure to award it the Montgomery County Contract.

## III. PARTIES

6. Plaintiff CNAC is a non-profit research and analysis organization based in Alexandria, Virginia. CNAC's purpose is to provide independent research and analysis to public sector organizations, such as NIH.

7. Defendant is the United States of America, acting by and through NIH, a part of HHS. NIH is the primary federal agency responsible for conducting and supporting biomedical and behavioral research, and the procuring agency in this protest.

## IV. FACTUAL BACKGROUND

### A. The National Children's Study.

8. With the Children's Health Act of 2000, Congress authorized and directed a consortium of federal agencies, led by the National Institute of Child Health and Human Development ("NICHD"), an NIH Institute, in partnership with the Centers for Disease Control and Prevention, the United States Environmental Protection Agency, and the National Institute of Environmental Health Sciences, to plan and conduct the National Children's Study ("NCS" or "Study"). National Children's Study Research Plan, June 20, 2007, Version 1.1 p. xv, available at: http://www.nationalchildrensstudy.gov/research/research_plan/Appendices.cfm.

9. The NCS is a long-term, large-scale longitudinal study designed to enroll and follow a nationally representative sample of approximately 100,000 children born in the United States, to assess the effects of various environmental influences (including physical, chemical, biological, and psychosocial) on children's health and development. Children's Health Act of 2000, 106 Pub. L. No. 310 , § 1004, 114 Stat. 1101, 1130-1131 (2000).

10. The Study is designed to collect information on children from birth through adulthood, with data collection to begin during, or prior to, pregnancy. RFP, Attachment 4 at 1. The protocols for the Study were developed over several years by staff at NIH with the involvement of many investigators in other government agencies and from the scientific community. National Children's Study Pre-Proposal Conference ("Conference"), March 7, 2007, at 5. Upon information and belief, more than 2,000 NIH staff and investigators at other

government agencies and from the scientific community at large contributed to the development of the protocols for the Study.

11. The data and information collected for the Study can be categorized into six broad types, as follows: (1) questionnaire data; (2) physical/medical examination data (e.g., blood pressure, sonograms, height, weight); (3) biologic specimens (e.g., blood, urine, hair, saliva); (4) environmental samples (e.g., dust, air, water, soil); (5) videos or still photographs; (6) medical record abstraction. RFP, Attachment 4 at 6.1.

12. Data collection for the NCS is organized by "Study Center" and Study location. There are 105 Study locations at which data will be collected and participants will be recruited. The 105 Study locations were chosen based on the need to achieve representative coverage of the United States with respect to geographic areas, metropolitan/non-metropolitan areas, and demography. RFP, Attachment 4 at 3.1. These Study locations were selected from all the counties in the United States, representing 79 metropolitan areas and 26 rural areas. Conference at 7. Montgomery County, Maryland, and Baltimore County, Maryland, were two of the counties selected to be included in the NCS. *See* RFP, Attachment 9 ("Map and List of Study Locations"). The goal of each Study location is to enroll a sufficient number of women such that there are 250 births per study location, per year, over a 4-year period. RFP, Attachment 4 at 1.

13. Study Centers are those entities or institutions chosen by NIH to establish contacts in the community, recruit research participants, perform data collection, and conduct reporting and analysis. *See* RFP, Attachment 3. NIH anticipates that 30-50 Study Centers will carry out the work of the 105 Study locations. Conference at 7.

14. Data collection for the Study locations was designed to be implemented in waves. In 2005 NIH conducted a procurement for the original first seven locations ("Vanguard

locations"), which were awarded and selected pursuant to a competitive process. NIH expected that Wave 1 (the current Solicitation) would add 30 additional locations, Wave 2 would add 35 locations, and in Wave 3 the final set of locations would be added. RFP, Attachment 4 at 3.1.

**B. <u>The Solicitation.</u>**

15. On March 1, 2007, the NICHD issued the Solicitation for the NCS, seeking proposals from organizations to serve as Study Centers for Wave 1 of the NCS. Conference at 9. The Solicitation was expected to award up to 20 new contracts to organizations that would be responsible for data collections in up to 30 Study locations. Conference at 11. Proposals were due April 17, 2007.

16. Pursuant to the RFP, institutions or consortia submitting a proposal for a contract to operate a Study Center were required to submit a proposal for a primary location ("BASE" proposal) for one of the pre-specified Study locations. *See* RFP, Amendment 4. By design, only one Study Center was to be awarded a contract for data collection in a given Study location. As per the RFP, the offeror was free to choose any of the Study locations, for which they were eligible, for inclusion in the BASE proposal. RFP § M.c. Eligibility was determined by geographic location. *Id.*

17. In response to the RFP, CNAC submitted a timely BASE proposal for the Baltimore Washington Study Center ("BWC"), for the pre-specified Study location of Montgomery County, Maryland. Through the work of seven research institutions in the Baltimore Washington Area, CNAC proposed to contribute the data collection and participant recruitment for 1000 live births over a 4-year period for Montgomery County, as required by the Study.

18. Pursuant to the RFP, offerors were strongly encouraged, but not required, to submit OPTION proposals for additional Study locations in addition to their BASE proposal.

*See* RFP, Attachment 6. As stated at the Pre-Proposal Conference, NIH anticipated that it would add the additional Study locations for Wave 2 and Wave 3, by exercising the OPTIONS that were awarded in the current Solicitation, and through additional solicitations. Conference at 21. However, to be considered for award of an OPTION for one or more additional Study locations, the offeror had to be selected for the BASE award for the NCS Study Center. RFP § M.f.

19. In response to the RFP, CNAC also submitted a timely OPTION proposal for the pre-specified Study location of Baltimore County, Maryland, to be operated by the same Study Center, BWC, as proposed in its BASE proposal and added three additional research groups to the team for the purpose of executing the OPTION. In its OPTION proposal, CNAC proposed to contribute 1000 live births over a 4-year period, as required by the Study, for the Baltimore County location.

20. BASE proposals and OPTION proposals were evaluated independently. RFP § M.d. Therefore, if a proposed Study Center scored low on an OPTION proposal, it would not affect the score the offeror received for its BASE proposal. *Id.*

21. Pursuant to the RFP, CNAC was required to propose a PI to oversee the operation of the Study Center: "Each contract that is awarded as a result of this solicitation will be awarded to a Prime Contractor (i.e. a single institute, organization, or other entity). There must be a single named Principal Investigator (PI) employed by the Prime Contractor responsible for oversight of the entire project." RFP, Amendment 2 at 2 (emphasis in original).

22. CNAC's proposed PI for its NCS proposal was Dr. Sarah L. Friedman, a former Government employee. On April 3, 2006, Dr. Friedman joined CNAC to serve as director of the Appalachian Regional Education Laboratory ("AREL"). Dr. Sarah L. Friedman has an M.A. in Educational Psychology from Cornell University and a Ph.D. in Developmental and



US_SW_600458622v1

Experimental Psychology from the George Washington University. The topics of Dr. Friedman's scholarly and scientific work include (a) the effects of preterm birth on cognitive, educational, and social development of children; (b) the interface of brain, cognition, and education; (c) the development of cognitive skills; (d) longitudinal follow-up research strategies; (e) environmental influences on psychological development; and (f) child care and children's psychological and health development.

23. Prior to her employment with CNAC, Dr. Friedman worked in various capacities for the federal government, as a research scientist at the National Institute of Mental Health, as a science administrator at the National Institute of Education, and as a science administrator and research scientist at the NICHD. Dr. Friedman was employed by the federal government until March 2006.

24. During her employment with NICHD, Dr. Friedman received two Merit awards for her leadership role in a large long-term longitudinal study known as the NICHD Study of Early Child Care and Youth Development.

25. From October 2005 through February 15, 2006, while an employee at NICHD, Dr. Friedman had a part-time role in assisting in the development of the infant neurodevelopmental protocol and the social environmental measures for the NCS. This role was in addition to Dr. Friedman's usual responsibilities at NICHD. This work was limited to making technical recommendations for a small number of assessment measures for the Study. Specifically, Dr. Friedman worked as the leader of a team that sifted through written and tabular materials prepared by experts in the scientific community and tabulated by NCS staff. Subsequently, her team made recommendations to the NCS Director and to the Study's Steering Committee regarding neurodevelopmental and social environment assessments in the NCS study

for the period between birth and 18 months of age. Some of the team's recommendations were accepted by the Study's Steering Committee; others were not. The team consisted of NCS staff, the staff of a contractor (WESTAT), and investigators at Vanguard Sites of the NCS. The team held approximately 20 meetings between October 26, 2005, and February 15, 2006.

26. During this period, Dr. Friedman had no official affiliation with NCS and had no authority regarding any other NCS protocols; her role was limited to making recommendations on the technical aspects of the neurodevelopmental protocol and social environment assessments.

27. At no point prior to the Notice of Award on October 5, 2007, was Dr. Friedman's previous employment with the federal government raised as a potential issue or conflict by NIH. Indeed, during August and September 2007, NIH conducted price and technical discussions with CNAC, and led CNAC to believe it had been "down-selected" for award for the Montgomery County Contract.

## C. <u>CNAC's Evaluation and NIH's Award Determination.</u>

28. The RFP stated that selection of an offeror for contract award was based on an evaluation of proposals against four factors, in order of importance: (1) Technical, (2) Cost, (3) Past Performance, and (4) Small Disadvantaged Business. RFP § M. Technical factors were considered to be of "paramount" importance. *Id.*

29. The technical evaluation for the Solicitation was conducted by two separate technical evaluation panels. *See* RFP, Amendment 6. One technical evaluation panel evaluated all proposals that proposed BASE locations west of the Mississippi River, while the other evaluation panel evaluated those to the east. *Id.* As CNAC's BASE proposal was for Montgomery County, Maryland, it was evaluated by the evaluation panel for locations to the east of the Mississippi. *Id.*

30. The RFP states that NIH expected to evaluate BASE proposals for Technical merit based on four evaluation criteria, with a total point score ranging from 0-100 points. The first criterion, "Understanding Project Requirements," was to be evaluated on a scale of 0-40 points, and states, in relevant part: "Offerors will demonstrate a clear understanding of the complexity and unique context of the NCS, the purpose of the research, the realities of data collection and data management, and problems that may impede the research and possible solutions." RFP § M.f (1).

31. The second criterion, "Organizational Qualifications and Experience," was to be evaluated on a scale of 0-30 points, and states, in relevant part: "Evidence of prior successful research experience in the conduct and coordination of epidemiologic studies, particularly longitudinal birth cohort studies that begin prior to or early in pregnancy." RFP § M.f (2).

32. The third criterion, "Personnel Qualifications and Experience," was to be evaluated on a scale of 0-20 points, and states, in relevant part: "Key personnel must have practical expertise and experience in the collection of population-based data and the conduct of epidemiologic studies, preferably longitudinal, multi-center cohort studies." RFP § M.f (3).

33. The fourth criterion, "Facilities," was to be evaluated on a scale of 0-10 points, and states, in relevant part: "Offerors must demonstrate that adequate facilities and equipment will be employed for data collection and other aspects of the Study." RFP § M.f (4).

34. OPTION proposals were to be evaluated in much the same manner as the BASE proposals, with the additional requirement that an offeror must be awarded a contract for a BASE proposal in order to receive a contract for an OPTION proposal. RFP § M.g. OPTION proposals were to be evaluated for technical merit, with a total point score ranging from 0-100 points. *Id.* The first criterion, "Understanding the Study Location and Plan for Engagement of

relevant communities," was to be evaluated on a scale of 0-40 points. *Id.* The second criterion, "Organizational Capacity," was to be evaluated on a scale of 0-30 points. *Id.* The third criterion, "Plan for Implementation," was to be evaluated on a scale of 0-30 points. *Id.*

35. By letter dated October 5, 2007, CNAC received notice that its proposal for the Montgomery County Contract was not selected for award in connection with the RFP. The only reason given for the rejection of CNAC's proposal was that, as a consequence of the Government's post-employment restrictions under 18 U.S.C. § 207, "the proposed Principal Investigator (PI) would not be able to fulfill the duties of a PI as contemplated by the terms and conditions of the Request for Proposals (RFP). As set forth in the terms of the RFP, the Principal Investigator is required to have substantial interactions with Government personnel during the performance of the contract." Notice of Award at 3 (a copy of which is attached to the Motion for Preliminary Injunction filed herewith).

36. Eighteen (18) proposals were received by NIH for locations east of the Mississippi on or before the due date. Twelve (12) awards with an effective date of September 28, 2007 were made under the subject RFP to the following institutions with proposals to operate centers to the east of the Mississippi: University of Pittsburgh, Brown University, The University of North Carolina at Chapel Hill, John Hopkins University, Yale University, The Children's Hospital of Philadelphia, University of Massachusetts Medical School, Mount Sinai School of Medicine, Michigan State University, Emory University, Northwestern University, and University of Mississippi Medical Center. *See* Notice of Award, at 1-2.

37. No awards were made under the Solicitation for Montgomery County, Maryland.

38. After it was notified that it failed to receive an award, CNAC timely requested a debriefing pursuant to 48 C.F.R. § 15.506. That debriefing was conducted on October 12, 2007.

39. In connection with its debriefing, CNAC received a Technical Evaluation Report ("TER") for its BASE proposal for Montgomery, County Maryland. For its BASE proposal, CNAC received an overall technical score of 81. TER at 1. This technical score was equivalent to, or greater than, the technical score of other institutions that received contract awards pursuant to the Solicitation. The reviewers found CNAC's BASE proposal to be "acceptable" and "recommended it for further consideration." *Id.* At the debriefing, CNAC was advised that the NCS Study Director, Dr. Peter Scheidt, had recommended CNAC for the Montgomery County Contract.

40. The TER highlighted CNAC's proposed PI, Dr. Friedman, as one of the CNAC's proposal greatest strengths. TER at 2. "The strengths of the proposal include the experience of the Principal Investigator . . . . " TER at 2. CNAC's proposed PI "has extensive prior experience in directing several national longitudinal and multi-sites studies, such as NICHD study of Early Child Care and Youth Development that enrolled and followed up the development of 1400 children from birth up to 15 years of age." TER at 4. Dr. Friedman is "an extremely experienced investigator in the assessment of several longitudinal NICHD funded studies." TER at 7.

41. CNAC also received a TER for its OPTION proposal for Baltimore County, Maryland. In response to its OPTION proposal, CNAC received an overall technical score of 77. TER at 12. The reviewers found CNAC's OPTION proposal to be "acceptable" and "recommended it for further consideration." *Id.*

42. On October 24, 2007, counsel for CNAC met with counsel for NIH to express CNAC's concern that it had not been selected for award of the Montgomery County Contract. In particular, counsel for CNAC questioned the basis for the determination that 18 U.S.C. § 207



US_SW_600458622v1

precluded Dr. Friedman from working for CNAC as the Principal Investigator on the Montgomery County Contract. On November 26, 2007 counsel for NIH sent a letter to the undersigned counsel reiterating the view that 18 U.S.C. § 207 is a bar to Dr. Friedman's proposed employment as a Principal Investigator for CNAC on the Montgomery County Contract. *See* November 26, 2007 Letter ("Letter") (a copy of which is attached to the Motion for Preliminary Injunction filed herewith).

## V. BASIS OF PROTEST

### A. <u>COUNT I: Dr. Friedman's Involvement in the Neurodevelopmental and Social Environment Assessments During Her Tenure as a Government Employee Does Not Qualify as Involvement on a Particular Matter, as Required For Disqualification Under 18 U.S.C. § 207.</u>

43. CNAC incorporates by reference all the preceding paragraphs.

44. NIH erred when it concluded that Dr. Friedman was barred from serving as a PI for CNAC by the post-employment provisions of 18 U.S.C. § 207. In particular, 18 U.S.C. § 207(a) permanently restricts former Government employees from participating after their Government service terminates in connection with a <u>particular matter</u>:

> (A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,
> (B) in which the person participated personally and substantially as such officer or employee, and
> (C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216 of this title [18 USCS § 216].

18 U.S.C. § 207(a)(1)(A)-(C).

45. In response to post-procurement inquiries from CNAC, the NIH has been unable to provide an adequate explanation for excluding Dr. Friedman on the basis of 18 U.S.C. § 207. By letter dated November 26, 2007, HHS simply states that it considers the Study to be a "particular matter involving specific parties." Letter at 2.

46. The proper interpretation and application of Section 207 are informed by 5 C.F.R. § 2637.201(c), which states, in relevant part, as follows:

> "Particular matter involving a specific party or parties"... Such a matter typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identifiable parties. Rulemaking, legislation, the formulation of general policy, standards or objectives, or other action of general application is not such a matter. Therefore, a former Government employee may represent another person in connection with a particular matter involving a specific party even if rules or policies which he or she had a role in establishing are involved in the proceeding.

47. At the time of Dr. Friedman's employment with NICHD, the NCS had not sufficiently evolved to constitute a "particular matter." During the period Dr. Friedman provided advice, the NCS was still in its developmental stage, which is evidenced by Dr. Friedman's role as an advisor in the area of infant neurodevelopment and social environment data collection.

48. 5 C.F.R. § 2637.201 further illustrates that NCS did not constitute a "particular matter" from which Dr. Friedman should now be barred:

> Example 4: An employee of the Office of Management and Budget participates substantially on the merits of a decision to reduce the funding level of a program, which has the effect of reducing the amount of money which certain cities receive to conduct youth work programs. <u>After leaving the Government she may represent any of the cities in securing funds for its youth program, since her participation was in connection with a program, not a particular matter involving specific parties.</u>

(emphasis added).

49. CNAC was prejudiced by NIH's improper evaluation of Dr. Friedman's involvement with the NCS during her tenure as a Government employee. Had NIH properly evaluated Dr. Friedman's role in accordance with 18 U.S.C. § 207, CNAC would have been awarded the Montgomery County Contract based on its BASE proposal under the Solicitation. Further, as a result of NIH's flawed analysis, CNAC will continue to suffer prejudice in future NCS procurements.

50. CNAC has suffered injury and will continue to suffer injury because of NIH's failure to fairly evaluate Dr. Friedman. CNAC has no adequate remedy at law for this injury.

## B. <u>COUNT II: Dr. Friedman Did Not Participate Personally and Substantially on the NCS During Her Tenure as a Government Employee, as Required For Disqualification Under 18 U.S.C. § 207.</u>

51. CNAC incorporates by reference all the preceding paragraphs.

52. To be permanently barred by 18 U.S.C. § 207(a), a former Government employee must also have "participated personally and substantially" in the particular matter.

53. As detailed above, Dr. Friedman's work on the NCS was in an advisory role, working with a team of other individuals. Her team was tasked with recommending measures for two of many technical protocols for a very narrow period (birth to 18 months) to be utilized in a Study designed to follow its participants until adulthood. The advisory role of Dr. Friedman on the neurodevelopmental and social environment assessments does not constitute "personal and substantial" involvement in the entire NCS, as NIH appears to have determined.

54. CNAC was prejudiced by NIH's improper evaluation of Dr. Friedman's involvement with the NCS during her tenure as a Government employee. Had NIH properly evaluated Dr. Friedman pursuant to 18 U.S.C. § 207, CNAC would have been awarded the Montgomery County Contract based on its BASE proposal under the Solicitation. Further, as a result of NIH's flawed analysis, CNAC will continue to suffer prejudice in future NCS procurements.

55. CNAC has suffered injury and will continue to suffer injury because of NIH's failure to fairly evaluate Dr. Friedman. CNAC has no adequate remedy at law for this injury.

## C. <u>COUNT III: Dr. Friedman Never Represented A Specific Party In Connection With Her Work For The NCS, As Required For Disqualification Under 18 U.S.C. § 207.</u>

56. CNAC incorporates by reference all the preceding paragraphs.

57. To be permanently barred by 18 U.S.C. § 207(a), the particular matter in which the former Government employee participated must also have involved "a specific party or specific parties at the time of such participation."

58. At the time of Dr. Friedman's involvement with NCS, there was no "specific party" connected to the Study, an important predicate to the imposition of a lifetime ban on her participation as PI at CNAC. As detailed above, Dr. Friedman's team worked in an advisory capacity, and provided input on the creation of technical assessments. Her input was not in relation to a "specific party" but was more akin to general policy making, which 18 U.S.C. § 207 does not prohibit. Notably, despite CNAC's requests, NIH has not identified any "specific party or specific parties" involved in the neurodevelopmental or social environment protocols on which Dr. Friedman worked during late 2005 and early 2006.

59. CNAC was prejudiced by NIH's improper evaluation of Dr. Friedman's involvement with the NCS during her tenure as a Government employee. Had NIH properly evaluated Dr. Friedman pursuant to 18 U.S.C. § 207, CNAC would have been awarded the Montgomery County Contract based on its BASE proposal under the Solicitation. Further, as a result of NIH's flawed analysis, CNAC will continue to suffer prejudice in future NCS procurements.

60. CNAC has suffered injury and will continue to suffer injury because of NIH's failure to fairly evaluate Dr. Friedman. CNAC has no adequate remedy at law for this injury.

**D. <u>COUNT IV: Dr. Friedman is Exempt From The Post-Employment Restrictions of 18 U.S.C. § 207 Because Her Work on NCS During Her Tenure as a Government Employee Was Solely to Provide Advice on Technical Matters.</u>**

61. CNAC incorporates by reference all the preceding paragraphs.

62. 18 U.S.C. § 207 has been construed to embody an exception to the general restrictions regarding former Government employees for those who participate in a particular matter solely in a technical or scientific role.[1] 5 C.F.R. § 2637.201(2) states:

> In connection with technical work, participation in projects generally involving one or more scientific or engineering concepts, in feasibility studies, or in proposed programs prior to the formulation of a contract will not restrict former Government employees with respect to a contract or specific programs entered into at a later date.

63. As further detailed above, Dr. Friedman's work for NCS during her employment with the Government falls well within the "technical matters" exception to the general restrictions on former Government employees. Dr. Friedman's role in NCS was clearly "in a proposed program prior to the formulation of a contract" therefore she is exempt from the restrictions of section 207. Further, Dr. Friedman's role in creating a small portion of the vast protocol created for this large-scale study is a benefit to NCS, rather than a conflict, and just the sort of situation for which this exception was developed.

64. CNAC was prejudiced by NIH's improper evaluation of Dr. Friedman's involvement with the NCS during her tenure as a Government employee. Had NIH properly

---

[1] The post-employment conflict of interest restrictions of 18 U.S.C. § 207 were substantially revised effective January 1, 1991, by the Ethics Reform Act of 1989, Pub. L. 101-194, 103 Stat. 1716, with technical amendments enacted by Pub. L. 101-280, 104 Stat. 149 (1990). As a consequence of these amendments, former employees are subject to varying post-employment restrictions depending upon the date of their termination from Government service. As a result of those revisions, 5 C.F.R. Part 2641 was updated to reflect only some of the changes to 18 U.S.C. § 207. In this regard, as of this date, Part 2641 contains guidance concerning only 18 U.S.C. § 207(c), which is applicable to former "senior personnel." Moreover, as stated in the United States Office of Government Ethics' ("USOGE") Summary of Post-Employment Restrictions of 18 U.S.C. § 207 ("Summary"), individuals terminating Government service after January 1991 should refer to USOGE's Summary and to 5 C.F.R. Part 2637, which provide guidance and remain persuasive concerning the interpretation of 18 U.S.C. § 207. *See* USOGE, Summary of Post-Employment Restrictions of 18 U.S.C. § 207, at 1 (2004), http://www.usoge.gov/pages/laws_regs_fedreg_stats/lrfs_files/othr_gdnc/og_sum207_04.pdf. Therefore, until USOGE revises the C.F.R. to reflect changes to 18 U.S.C. § 207 in its entirety, 5 C.F.R. § 2637 remains applicable.

evaluated Dr. Friedman pursuant to 18 U.S.C. § 207, CNAC would have been awarded the Montgomery County Contract based on its BASE proposal under the Solicitation. Further, as a result of NIH's flawed analysis, CNAC will continue to suffer prejudice in future NCS procurements.

65. CNAC has suffered injury and will continue to suffer injury because of NIH's failure to fairly evaluate Dr. Friedman. CNAC has no adequate remedy at law for this injury.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff CNAC prays that this Court grant the following relief:

1. A preliminary injunction to be in effect until the Court's final decision on the merits of this protest;

2. A declaratory judgment that NIH's decision not to award the Montgomery County Contract to CNAC was arbitrary, capricious, and otherwise not in accordance with law, and setting it aside;

3. A permanent injunction directing NIH to award the Montgomery County Contract to CNAC;

4. A declaratory judgment that Dr. Sarah Friedman is not barred from working as a PI for CNAC on any contracts awarded to CNAC arising out of the National Children's Study;

5. Award CNAC its costs of pursuing this case, including reasonable attorneys' fees and expenses; and

6. Such other relief as the Court deems just and proper.

Dated: December 5, 2007

Respectfully submitted,

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel for The CNA Corporation

*Of Counsel:*

Daniel S. Herzfeld
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7900
(703) 770-7901 (fax)