ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

FILED
DEC 6 2007
U.S. COURT OF FEDERAL CLAIMS

THE CNA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No: 07-858 C

Judge: _________

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

Date: December 5, 2007

*Of Counsel:*
Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7612
(703) 770-7901 (fax)

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel for The CNA Corporation

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. QUESTION PRESENTED ..... 2

III. JURISDICTION AND STANDING ..... 2

IV. STATEMENT OF THE CASE ..... 2

V. STANDARD FOR INJUNCTIVE RELIEF ..... 6

VI. ARGUMENT ..... 7

A. CNAC Has a Substantial Likelihood of Success on the Merits. ..... 7

1. NIH's Decision Not to Award CNAC the Montgomery County Contract was Arbitrary, Capricious, and Without A Rational or Reasonable Basis. ..... 8

2. CNAC was Prejudiced by NIH's Conclusion that Dr. Friedman was Barred by the Post-Employment Provisions of 18 U.S.C. § 207 ..... 10

B. CNAC Will Suffer Irreparable Harm Without Injunctive Relief ..... 11

C. The Harm to CNAC Outweighs Any Harm to Defendants. ..... 13

D. The Public Interest Will Be Served By Granting the Preliminary Injunctive Relief. ..... 13

VII. CONCLUSION ..... 14

# TABLE OF AUTHORITIES

Cases

*Aeroplate Corp. v. United States*,
67 Fed. Cl. 1 (2005) .......... 6

*Alfa Laval Separation, Inc. v. United States*,
175 F.3d 1365 (Fed. Cir. 1999) .......... 7

*Am. Fed. of Gov't Employees, AFL-CIO v. United States*,
258 F.3d 1294 (Fed. Cir. 2001) .......... 2

*Dairy Maid Dairy, Inc. v. United States*,
837 F. Supp. 1370 (E.D. Va. 1993) .......... 12, 13

*Data Gen. Corp. v. Johnson*,
78 F.3d 1556 (Fed. Cir. 1996) .......... 8

*Day & Zimmermann Servs. v. United States*,
38 Fed. Cl. 591, *appeal dismissed*, 132 F.3d 49 (1997) .......... 13

*FMC Corp. v. United States*,
3 F.3d 424 (Fed. Cir. 1993) .......... 7

*Hybritech Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988) .......... 7

*Informatics Corp. v. United States*,
40 Fed. Cl. 508 (1998) .......... 12

*Magnavox Elec. Sys. Co. v. United States*,
26 Cl. Ct. 1373 (1992) .......... 12

*Mark Dunning Indus. v. United States*,
60 Fed. Cl. 687 (2004) .......... 7, 13

*Motorola, Inc. v. United States*,
988 F.2d 113 (Fed. Cir. 1993) .......... 12

*Overstreet Elec. Co. v. United States*,
47 Fed. Cl. 728 (2000) .......... 11, 13

*Scanwell Labs v. Schaffer*,
424 F.2d 859 (D.C. Cir. 1970) .......... 13

*Seattle Sec. Servs., Inc. v. United States*,
45 Fed. Cl. 560 (2000) .......... 11

*United Int'l Investigative Servs., Inc. v. United States*,
1 Fed. Cl. 312 (1998) .......... 11, 12

*United States Ass'n of Importers of Textiles & Apparel v. United States*,
413 F.3d 1344 (Fed. Cir. 2005) .......... 6

Statutes and Codes

18 U.S.C. § 207 .......... passim
28 U.S.C. § 1491(b), et seq. .......... 2, 7
5 C.F.R. § 2637.201 .......... 9
5 U.S.C. § 706 .......... 7

Rules and Regulations

RCFC 65(a) .......... 1

Other Authorities

Children's Health Act of 2000, 106 Pub. L. No. 310, § 1004, 114 Stat. 1101 (2000) .......... 2

## I. INTRODUCTION

Pursuant to RCFC 65(a), Plaintiff, The CNA Corporation ("CNAC"), respectfully requests that this Court issue a Preliminary Injunction enjoining Defendant, United States of America ("United States"), acting through the National Institutes of Health ("NIH"), a part of the Department of Health and Human Services ("HHS"), and its officers, agents, and employees, as well as all other persons in active concert or participation with it, from commencing or continuing performance of any contract for the Montgomery County, Maryland location awarded in connection with Request for Proposals ("RFP") No. NIH-NICHD-NCS-07-11 (the "Solicitation" or "RFP"), entitled National Children's Study ("NCS" or "Study"), pending a final determination on the merits of this protest by this Court.

CNAC challenges NIH's decision not to award a contract to CNAC for the Montgomery County, Maryland Study location (the "Montgomery County Contract") in connection with its recent Solicitation, as its decision cannot be justified by statute and regulation. CNAC requests a preliminary injunction to prevent NIH from awarding the Montgomery County Contract to any offeror other than CNAC. The decision not to award CNAC the Montgomery County Contract was improper because it was based on a flawed analysis of the post-employment restrictions of former Government employees under 18 U.S.C. § 207. Had NIH properly evaluated CNAC's proposal, CNAC would have been awarded the Montgomery County Contract. Thus, NIH's decision should be set aside as arbitrary, capricious, and otherwise contrary to applicable law and regulation. Absent such injunctive relief, CNAC will suffer substantial and irreparable harm. CNAC requests that this preliminary injunction remain in effect until this Court decides the merits of CNAC's Complaint, filed herewith.

## II. QUESTION PRESENTED

Is CNAC entitled to a preliminary injunction based on NIH's failure to comply with applicable statutes and regulations in its decision not to award CNAC the Montgomery County Contract pursuant to its Solicitation?

## III. JURISDICTION AND STANDING

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b), which expressly provides this Court with jurisdiction "to render judgment on an action by an interested party objecting to…the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." CNAC was an unsuccessful offeror and is an "interested party," as it had a direct economic interest in the Montgomery County Contract. CNAC was prejudiced by NIH's actions, as CNAC suffered direct economic harm as a result of NIH's failure to award it the Montgomery County Contract. *See Am. Fed. of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (defining "interested party" as "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract").

## IV. STATEMENT OF THE CASE

As set forth more fully in CNAC's accompanying Complaint for Declaratory, Preliminary and Permanent Injunctive Relief, the Solicitation at issue arose out of the National Children's Study ("NCS" or "Study"). The NCS is a long-term, large-scale longitudinal study designed to enroll and follow a nationally representative sample of approximately 100,000 children born in the United States, from birth until adulthood, to assess the effects of various environmental influences (including physical, chemical, biological, and psychosocial) on children's health and development. *See* Children's Health Act of 2000, 106 Pub. L. No. 310, § 1004, 114 Stat. 1101, 1130-1131 (2000).

The Solicitation sought proposals from organizations seeking to serve as "Study Centers" for the NCS. Study Centers are those entities or institutions chosen by NIH to establish contacts in the community, recruit research participants, and perform data collection, reporting, and analysis for the 105 Study locations throughout the United States. The Solicitation required offerors to submit a BASE proposal for its proposed Study Center. *See* RFP, Amendment 4. Offerors were also strongly encouraged to submit OPTION proposals, from which the additional Study locations would be awarded. *See* RFP, Attachment 6.

In response to the Solicitation, CNAC, a non-profit research and analysis organization, submitted a timely BASE proposal for the Baltimore Washington Study Center ("BWC"), for the pre-specified Study location of Montgomery County, Maryland – the Montgomery County Contract. CNAC also submitted an OPTION proposal, for the Baltimore County, Maryland Study location, to be operated by the same Study Center, BWC, as proposed by CNAC for the Montgomery County Contract. In order to be considered for award of an OPTION proposal, the offeror had to have its BASE proposal selected for award. RFP § M.f.

Pursuant to the RFP, CNAC was required to propose a Principal Investigator ("PI") to oversee the operation of the Study Center. CNAC's proposed PI was Dr. Sarah L. Friedman, a former Government employee, who was well-qualified to assume the role of PI. On April 3, 2006, Dr. Friedman joined CNAC to serve as director of the Appalachian Regional Education Laboratory ("AREL"). Dr. Sarah L. Friedman has an M.A. in Educational Psychology from Cornell University and a Ph.D. in Developmental and Experimental Psychology from the George Washington University. The topics of Dr. Friedman's scholarly and scientific work include (a) the effects of preterm birth on cognitive, educational, and social development of children; (b) the interface of brain, cognition, and education; (c) the development of cognitive skills; (d)

longitudinal follow-up research strategies; (e) environmental influences on psychological development; and (f) child care and children's psychological and health development.

Prior to her employment with CNAC, Dr. Friedman worked in various capacities for the federal government, as a research scientist at the National Institute of Mental Health, as a science administrator at the National Institute of Education, and as a science administrator and research scientist at the National Institute of Child Health and Human Development ("NICHD"). During her employment with NICHD, terminating in March 2006, Dr. Friedman received two Merit awards for her leadership role in a large long-term longitudinal study known as the NICHD Study of Early Child Care and Youth Development.

From October 2005 through February 15, 2006, while an employee at NICHD, Dr. Friedman had a part-time role in assisting in the development of the infant neurodevelopmental protocol and the social environmental measures for the NCS. This role was in addition to Dr. Friedman's usual responsibilities at NICHD. This work was limited to making technical recommendations for a small number of assessment measures for the Study. Specifically, Dr. Friedman worked as the leader of a team that sifted through written and tabular materials prepared by experts in the scientific community and tabulated by NCS staff. Subsequently, her team made recommendations to the NCS Director and to the Study's Steering Committee regarding neurodevelopmental and social environment assessments in the NCS study for the period between birth and 18 months of age. Some of the team's recommendations were accepted by the Study's Steering Committee; others were not. The team consisted of NCS staff, the staff of a contractor (WESTAT), and investigators at Vanguard Sites of the NCS. The team held approximately 20 meetings between October 26, 2005 and February 15, 2006.

By letter, dated October 5, 2007, CNAC received notice that its proposal for the Montgomery County Contract was not selected for award in connection with the RFP. *See* Notice of Award at 1 (a copy of which is attached to the Motion for Preliminary Injunction filed herewith). The sole reason given for the rejection of CNAC's proposal was that Dr. Friedman was barred from serving as PI, as a consequence of the Government's post-employment restrictions under 18 U.S.C. § 207.

> [T]he proposed Principal Investigator (PI) would not be able to fulfill the duties of a PI as contemplated by the terms and conditions of the Request for Proposals (RFP). As set forth in the terms of the RFP, the Principal Investigator is required to have substantial interactions with Government personnel during the performance of the contract.

Notice of Award at 3. At no point prior to the Notice of Award on October 5, 2007, was Dr. Friedman's previous employment with the federal government raised as a potential issue or conflict by NIH. Indeed, during August and September 2007, NIH conducted price and technical discussions with CNAC, and led CNAC to believe it had been "down-selected" for award for the Montgomery County Contract.

Eighteen (18) proposals were received by NIH for locations east of the Mississippi on or before the due date. Twelve (12) awards with an effective date of September 28, 2007 were made under the subject RFP for Study centers to the east of the Mississippi river. No awards were made under the Solicitation for Montgomery County, Maryland.

In connection with its requested debriefing, CNAC received a Technical Evaluation Report ("TER") for its BASE proposal for Montgomery, County Maryland. For its BASE proposal, CNAC received an overall technical score of 81. TER at 1. This technical score was equivalent to, or greater than, the technical score of other institutions who received contract awards for Study Centers east of the Mississippi under the RFP. The reviewers found CNAC's BASE proposal to be "acceptable" and "recommended it for further consideration." *Id.* At the

debriefing, CNAC was advised that the NCS Study Director, Dr. Peter Scheidt, had recommended CNAC for the Montgomery County Contract.

The TER highlighted CNAC's proposed PI, Dr. Friedman, as one of the proposals greatest strengths. TER at 2. "The strengths of the proposal include the experience of the Principal Investigator…" TER at 2. CNAC's proposed PI "has extensive prior experience in directing several national longitudinal and multi-sites studies, such as NICHD study of Early Child Care and Youth Development that enrolled and followed up the development of 1400 children from birth up to 15 years of age." TER at 4. Dr. Friedman is "an extremely experienced investigator in the assessment of several longitudinal NICHD funded studies." TER at 7.

CNAC also received a TER for its OPTION proposal for Baltimore County, Maryland. In response to its OPTION proposal, CNAC received an overall technical score of 77. TER at 12. The reviewers found CNAC's OPTION proposal to be "acceptable" and "recommended it for further consideration." *Id.*

Despite repeated attempts by CNAC and the undersigned counsel, NIH has been unable to provide an adequate explanation for its conclusion that Dr. Friedman's prior Government employment permanently barred her from the role of PI for the Montgomery County Contract and for its subsequent decision not to award CNAC the Montgomery County Contract on that basis.

## V. <u>STANDARD FOR INJUNCTIVE RELIEF</u>

In considering CNAC's motion for preliminary injunctive relief, this Court must weigh the following four factors: (i) CNAC's likelihood of success on the merits; (ii) the immediate and irreparable injury to CNAC; (iii) the public interest; and (iv) the balance of the hardship on all the parties. *See Aeroplate Corp. v. United States*, 67 Fed. Cl. 1, 2 (2005); *United States Ass'n of Importers of Textiles & Apparel v. United States*, 413 F.3d 1344, 1347-48 (Fed. Cir. 2005). No

single factor is determinative, and "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988) ("These factors, taken individually, are not dispositive; rather, the . . . court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested.")

Applying these factors to the circumstances of this case, CNAC is entitled to injunctive relief.

## VI. ARGUMENT

### A. CNAC Has a Substantial Likelihood of Success on the Merits.

In post-award bid protests such as this one, the Court will set aside a procurement decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 28 U.S.C. § 1491(b)(4) (APA standard of review (5 U.S.C. § 706) to be applied in bid protest actions before the COFC). To prevail on the merits of this bid protest action, CNAC must show "a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

As the court stressed in *Mark Dunning*, "to succeed in a bid protest action, '[a] protestor must prove by a preponderance of the evidence the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation.'" *Mark Dunning Indus. v. United States*, 60 Fed. Cl. 687, 689 (2004). The *Dunning* Court continued, "[u]nder this standard, a frustrated bidder must 'establish that (1) the Government officials involved in the procurement process were without a rational and reasonable basis for their decision, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations.' Further, the protester must also show that it was prejudiced by the error in the procurement process." *Id.* (internal citations omitted). To establish prejudice, a protestor must

show "that there was a 'substantial chance' it would have received the contract award but for the alleged error." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

### 1. NIH's Decision Not to Award CNAC the Montgomery County Contract was Arbitrary, Capricious, and Without A Rational or Reasonable Basis.

NIH based its decision not to award CNAC the Montgomery County Contract on its conclusion that Dr. Friedman was permanently barred by the post-employment provisions of 18 U.S.C. § 207 from working for CNAC as its PI. By letter dated November 26, 2007, HHS simply states that it considers the Study to be a "particular matter involving specific parties." *See* November 26, 2007 Letter (a copy of which is attached to the Motion for Preliminary Injunction filed herewith). However, 18 U.S.C. § 207 only permanently bars former Government employees from participating in connection with a particular matter:

> (A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,
> (B) in which the person participated personally and substantially as such officer or employee, and
> (C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216 of this title [18 USCS § 216].

18 U.S.C. § 207(a)(1)(A)-(C). At the time of her employment with NICHD, the NCS had not sufficiently evolved to constitute a "particular matter." During the period Dr. Friedman provided advice, the NCS was still in its developmental stage, which is evidenced by Dr. Friedman's role as a mere advisor in two discrete areas of the NCS: infant neurodevelopment, and social environment data collection.

Further, Dr. Friedman's work on the NCS was in an advisory role, and did not constitute a "personal and substantial contribution," as also required by 18 U.S.C. § 207 to impose a lifetime ban. Rather, Dr. Friedman worked with a team of other individuals to recommend

technical protocols for a very narrow period (birth to 18 months) of a massive nationwide Study designed to follow its participants until adulthood.

Additionally, to be permanently barred by 18 U.S.C. § 207, the former Government employee must participate in a particular matter "which involved a specific party or specific parties at the time of such participation." At the time of Dr. Friedman's involvement with NCS, there was no "specific party" connected to the Study, an important statutory requirement which must be met prior to the imposition of the "lifetime ban" embodied in 18 U.S.C. § 207. As detailed above, Dr. Friedman's team worked in an advisory capacity, and provided input on the creation of technical assessments. Her input was not in relation to a "specific party" but was more akin to general policy making, not prohibited by 18 U.S.C. § 207.

Notably, despite CNAC's requests, NIH has not identified any "specific party or specific parties" involved in the neurodevelopmental or social environment protocols on which Dr. Friedman worked during late 2005 and early 2006. 5 C.F.R. § 2637.201 further illustrates that NCS did not constitute a "particular matter" from which Dr. Friedman should now be barred:

> Example 4: An employee of the Office of Management and Budget participates substantially on the merits of a decision to reduce the funding level of a program, which has the effect of reducing the amount of money which certain cities receive to conduct youth work programs. <u>After leaving the Government she may represent any of the cities in securing funds for its youth program, since her participation was in connection with a program, not a particular matter involving specific parties.</u>

(emphasis added).

Even if the Court accepts NIH's interpretation of 18 U.S.C. § 207, section 207 has been construed to embody an exception to the general restrictions regarding former Government employees for those who participate in a particular matter solely in a technical or scientific role. 5 C.F.R. § 2637.201(2) states:

> In connection with technical work, participation in projects generally involving one or more scientific or engineering concepts, in feasibility studies, or in proposed programs prior to the formulation of a contract will not restrict former Government employees with respect to a contract or specific programs entered into at a later date.

As further detailed above, Dr. Friedman's work for NCS during her employment with the Government qualifies as an exception to the general restrictions on former Government employees. Dr. Friedman's role in NCS was clearly "in a proposed program prior to the formulation of a contract" therefore she is exempt from the restrictions of section 207. Further, Dr. Friedman's role in creating a small portion of the vast protocol created for this large-scale Study is a benefit to NCS, rather than a conflict, and just the sort of situation for which this exception should be recognized.

2. **<u>CNAC was Prejudiced by NIH's Conclusion that Dr. Friedman was Barred by the Post-Employment Provisions of 18 U.S.C. § 207.</u>**

As further detailed above, NIH erred when it concluded that Dr. Friedman was permanently barred from employment as CNAC's PI for the Montgomery County Contract. Had NIH properly evaluated Dr. Friedman's tenure as a Government employee, CNAC would have received the Montgomery County Contract. As discussed in Section II, CNAC's BASE proposal was technically "acceptable" and its TER score was equivalent to, or higher than, other institutions who received contracts as a result of the RFP. At the debriefing, CNAC was specifically advised that the NCS Study Director, Dr. Peter Scheidt, had recommended CNAC for the Montgomery County Contract.

Further, Montgomery County, Maryland is a designated Study location, so a Study Center for that location will be awarded by NIH at some point in the future either through an OPTION award or another solicitation. Also, as a result of NIH's error, CNAC's OPTION

proposal for Baltimore County, Maryland could not be granted, as only those institutions who received BASE awards could be considered for OPTION awards.

For all of the foregoing reasons, CNAC was severely prejudiced by NIH's conclusion not to select CNAC for award of the Montgomery County Contract; this requirement for obtaining preliminary injunctive relief is clearly met here.

**B. <u>CNAC Will Suffer Irreparable Harm Without Injunctive Relief.</u>**

CNAC also meets the second prong of the test for preliminary injunctive relief -- irreparable harm to the plaintiff. NIH's erroneous conclusion regarding the implications of Dr. Friedman's participation in the Solicitation, coupled with the lost revenue that CNAC would have otherwise received if it had been awarded the Montgomery County Contract, constitutes irreparable injury that justifies the granting of injunctive relief.

First, under clear precedent from this Court and other courts considering bid protest cases, NIH's denial of CNAC's proposal for the NCS, based solely on the prior Government service of Dr. Friedman, is itself irreparable harm. This Court regularly holds that "this type of loss, deriving from a lost opportunity to compete in a fair competitive bidding process for a contract, has been found sufficient to prove irreparable harm." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000); *see also United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("The opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000) ("a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm"). Likewise, the "denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm." *Overstreet*

*Elec. Co.*, 47 Fed. Cl. at 744 n.25; *Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1381 (E.D. Va. 1993).

Significantly, the NIH's above-described flawed analysis and violations of procurement statutes and regulations prevented CNAC from being properly considered for the Montgomery County Contract and, more importantly, from having its offer fairly and lawfully evaluated. Such a failure constitutes irreparable harm under the second prong for injunctive relief. Further, NIH's flawed conclusion may prejudice CNAC's pursuit of future contracts from federal agencies and will effectively preclude CNAC from receiving future NCS contracts.

In addition, the loss in resources and funding that CNAC would have otherwise received if it had been awarded the Solicitation constitutes irreparable harm. *See Magnavox Elec. Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992), ("Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete.' This is an irreparable injury."), *disapproved on other grounds in Motorola, Inc. v. United States*, 988 F.2d 113, 116 (Fed. Cir. 1993)). Injunctive relief is thus appropriate to prevent this otherwise un-redressable injury. *Informatics Corp. v. United States*, 40 Fed. Cl. 508, 518 (1998) ("Plaintiff has demonstrated that absent injunctive relief it would suffer irreparable harm by the loss of anticipated profits from a contract award ... an action at law would be unavailing, because plaintiff could recoup only its bid preparation costs in a suit for damages."); *United Int'l Investigative Servs.*, 41 Fed. Cl. at 323 ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm."). Taken together with CNAC's right to have its offer fairly and lawfully considered, the irreparable economic harm to CNAC more than suffices to meet this Court's standard of irreparable harm.

**C. The Harm to CNAC Outweighs Any Harm to Defendants.**

While CNAC will suffer irreparable harm if the award of the Montgomery County Contract is not enjoined pending the resolution of the merits of this Protest, NIH will not be harmed because any short delay is negligible considering the planned length of the Study. Compared to the significant and irreparable harm to CNAC, the impact on NIH is minimal. Thus, the balance of hardship weighs in favor of granting the requested injunctive relief. *Day & Zimmermann Servs. v. United States*, 38 Fed. Cl. 591, 611, *appeal dismissed*, 132 F.3d 49 (1997) ("[A]ny delay caused by this injunction does not deprive the Army of service at Ft. Bragg, as the incumbent…will continue to provide these services until such time as an award is made in accordance with our ruling."). Further, as NIH has not yet awarded a contract for the Montgomery County, work at this location has not yet commenced.

**D. The Public Interest Will Be Served By Granting the Preliminary Injunctive Relief.**

In evaluating this final factor, this Court has stated, "[i]t is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Overstreet Elec. Co.*, 47 Fed. Cl. at 744; *see also Dairy Maid Dairy*, 837 F. Supp. at 1382 (*citing Scanwell Labs v. Schaffer*, 424 F.2d 859, 866-67 (D.C. Cir. 1970)); *see also Day & Zimmerman Servs.*, 38 Fed. Cl. at 610 (finding protection of the integrity of the procurement system to be in the public interest). It is equally true that "a public interest is manifest in ensuring that the Government closely adhere to the requirements of the procurement regulations." *Overstreet Elec. Co.*, 47 Fed. Cl. at 744; *cf Mark Dunning Indus., Inc. v. Perry*, 890 F. Supp. 1504, 1518 (M.D. La. 1995) (holding that the public interest in maintaining the integrity of the procurement process and ensuring fair

and open competition outweighed the public interest in avoiding disruption of the procurement process).

In this case, the integrity of the procurement process demands that NIH conduct the competition in a manner that is consistent with federal statutes and regulations. Because NIH has failed to do so, the public interest would be clearly served by the correction of this failure, especially because there is essentially no adverse impact on the Government and because there would be substantial irreparable harm to CNAC absent the requested injunctive relief. Further, NIH's erroneous conclusion in this case that Dr. Friedman is barred by the post-employment provisions of 18 U.S.C. § 207 from working for CNAC as the PI on the Montgomery County Contract itself implicates significant public policy issues. NIH's sweeping and unprecedented application of 18 U.S.C. § 207 has important implications for former Government employees at large and for post-government service employment options for current Government employees.

## VII. CONCLUSION

For the reasons stated above, CNAC respectfully requests this Court to issue a Preliminary Injunction directing NIH to refrain from awarding the Montgomery County Contract to any offeror other than CNAC.

Dated: December 5, 2007

Respectfully submitted,

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel for The CNA Corporation

*Of Counsel:*
Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7612
(703) 770-7901 (fax )

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Plaintiff's Memorandum of Points and Authorities in Support of its Motion for a Preliminary Injunction was served by e-mail December 5, 2007 upon:

Matthew Solomson, Esq.
Trial Attorney, Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
matthew.solomson@usdoj.gov

Daniel S. Herzfeld